## TEXAS & N. O. R. CO. v. McELHENY et al. (No. 3386.)

Court of Civil Appeals of Texas. Texarkana. March 30, 1927.

Rehearing Denied April 28, 1927.

Carriers ⟨Key⟩320(18)—Evidence in action for death of person riding on drover's pass held to require directed verdict for railroad.

In action against railroad to recover for death resulting from injuries received by deceased when traveling on a drover's pass and occurring when deceased either voluntarily stepped from running board of engine on which he was riding in front of moving car, or when he was thrown off by sudden motion of engine after being disconnected during flying switch, evidence of railroad's negligence *held* to require directed verdict for railroad.

Appeal from District Court, Harris County; Roy F. Campbell, Judge.

Suit by Mrs. C. W. McElheny and others, against the Texas & New Orleans Railroad Company and others. Judgment for plaintiffs against defendant named, and defendant named appeals. Reversed and rendered.

Baker, Botts, Parker & Garwood, Garrison & Watson, and Roy L. Arterbury, all of Houston, for appellant.

Vinson, Elkins, Sweeton & Weems, of Houston, for appellees.

HODGES, J. On July 18, 1921, C. W. McElheny was run over and fatally injured by

---

one of appellant's cars in Englewood yards at Houston, Tex. The wife and children of the deceased 'filed this suit for damages against the appellant. Several other railway companies were also made parties defendant, but were eliminated in the trial below. A judgment was rendered against the appellant alone for $22,270.

The facts show that McElheny was moving his household goods and live stock from Pharr, Tex., to Sherman, Tex. He had secured from the St. Louis, Brownsville & Mexico Railroad Company two cars, into which he loaded his stock and goods. A through bill of lading was issued for the freight, and a drover's pass was issued to McElheny and his son Oscar authorizing them to accompany the shipment as caretakers. The drover's pass, however, was only to Houston. McElheny and his son rode in the cars with the stock and goods. They arrived at Houston between 2 and 3 o'clock in the morning of July 18. Their goods were carried to what is called the Hardy Street Crossing, where McElheny had been told he could secure further transportation for himself and his son over appellant's line to Sherman. At Hardy Street Crossing, McElheny left the cars and inquired for the place where he could get his pass renewed. He was met by F. E. Coffey, appellant's engine foreman, whose deposition was introduced by the appellee in the trial below. Coffey testified:

"Early in the morning of that day I remember receiving a car from the Gulf Coast Lines, what they call an emigrant car. I received that car on the Houston Belt and Terminal short connection that connects with the Southern Pacific at West street. * * * To the best of my recollection, this car was received about 4:25 or 4:30 a. m. The car was taken to the Englewood yards, the west end of Englewood yards. The occasion for taking the car to that place was to get it on the train going north to Sherman. * * * There was a fellow—Mr. McElheny—at Hardy street when I met him, who wanted to get an emigrant contract for riding on the cars, to show he was the man in charge, and I told him that he would have to get that at Englewood. Englewood is * * * about three miles from Hardy street. When we left Hardy street I stopped and put Mr. McElheny on the front end of the engine to ride to where his cars were. It was about three blocks to where his cars were, and I was going after them, and to save time I rode him out to where his cars were. The last time I saw him was after I got to the connection and he got off the engine, and I told him to get in his cars and sit down and I would take him to Englewood, then I would meet him there and show him where to get his contract fixed up."

The two cars were attached to a switch engine. The front of the engine was next to the front box car, and the engine moved backward. Those were the only cars in that train. When they arrived at Englewood, the engine stopped on what is called the "lead track." The purpose of the crew was to switch those cars off onto a spur track until the train going north to Sherman was made up. That train was due to leave about 5 o'clock. McElheny and his son rode in the front box car going from Hardy street to Englewood yards. When the engine stopped, a man with a lantern passed by, and McElheny said to his son, "There is the man I want to see." He immediately got out of the car, on the right-hand side facing the engine, and walked toward the engine. Oscar McElheny testified:

"About that time I heard somebody hello, 'Let it go,' and the car started off of a sudden. The exhaust of the engine was loud, and we ran about 60 feet, and the engine slowed down and the car jammed against the engine coupling, and the mules were thrown forward in the car and I was almost thrown out. I was holding, and as the bump happened the cars came together and the cars went off to the right on the track and the engine went down on the lead track."

He further testified that he was looking at his father as he walked down toward the engine, and that just as the engine began to move in response to the call, "Let it go," his father stepped on the running board between the engine and the box car in which he (the witness) was riding. He never saw his father any more until after the accident, when he saw him in a dying condition lying on the platform. Other testimony shows that the movements described by this witness occurred in making what is called a "drop switch," or a "flying switch." Coffey thus describes how such a switch is made:

"Four men are necessary to execute the drop switch. The foreman gives the signal. The highball man cuts the switch. The pin-puller cuts the engine off. The field man is on top to set the brakes when it gets in the clear. In case anything should happen and he sees the engine don't clear or something, he stops the car."

Coffey further testified that on that occasion M. W. Wright was the pin-puller, and Bob Lyle was the field man who rode on top of the car on the end next to the engine.

M. W. Wright, the pin-puller, the only eyewitness to the accident who testified upon the trial, said:

"With reference to where it was that Mr. McElheny rode the footboard of the engine, I couldn't say. I did not see McElheny, that I remember of, at all until they picked him up off the ground; that is the first time I saw him. * * * When the foreman, Coffey, told us to make the drop, he (Coffey) walked towards the switch, and I stood right at the east end of the engine and didn't move until the front end of the engine came by me, and I got on it and lifted the pin with my weight just as the front end of the engine came by me."

He further testified:

"I had to pull this pin at the time when the slack was just exactly right. The slack was

just about right at the time I stepped on the footboard, and we didn't run over three feet. When I stepped on the running board, I was watching the foreman back behind. I never did look at the handle of the crank or anything; I just grabbed it. * * * The first time I saw Mr. McElheny he was right in front of the car—well, the car was passing over him when I saw him. I did not at the time, however, know it was him. I didn't know who it was. I did not see him fall off the running board. I never seen him at all. I didn't see him step off."

Again he said:

"With reference to how far did the engine run after I pulled the pin before I saw the old man on the track, my answer is, well, I was about an engine length. I was still on the engine after I pulled the pin. I had run about an engine length when I observed him in front of me on the track—I mean in front of the cars on the track. * * * He was under the end of the car when I saw him. I could just tell it was a man; that's all. I didn't know who it was. I did not know who he was, or anything at all about it. I didn't know whether it was the crew or anybody else. They all thought it was me; everybody out there thought it was me. They even went over and picked up the hat; they thought it was my hat."

The statements of Wright are corroborated in the main by the testimony of Coffey as to what Lyle, the field man, exclaimed at about the time the car ran over the body of McElheny.

The plaintiffs alleged negligence on the part of the railway employees: (1) In carelessly causing the engine and cars to be "violently, suddenly, unusually, and unnecessarily jerked"; (2) in failing to warn the deceased that a flying switch was about to be made, in time to allow him to alight from the train to a place of safety; and (3) in failing to notify the deceased that they were about to move the engine. Defendant's answer was a general denial and a plea of contributory negligence.

As a preamble to his submission of special interrogatories, the court gave the following instructions to the jury:

"In this case you are instructed that the deceased in this case was a passenger upon the train in question, with the privilege of riding in the cars in which his stock and household goods were loaded or on the caboose of such train on which such cars were loaded. You are instructed that at the time of the injury of the deceased, C. W. McElheny, he was a passenger upon such train, and that the defendant, its agents, servants, and employees, owed to him the highest degree of care practicable under all the facts and circumstances, and that failure to exercise such care would be negligence."

Then followed special interrogatories, in response to which the jury found: (1) That on the occasion of the injury the servants and employees of the railway company violently, unusually, and unnecessarily jerked the en-

gine and cars at the time of making the flying switch; that this was negligence and a proximate cause of the injury; and (2) that they failed to warn McElheny of the movement of the engine and cars at Englewood in time for him to re-enter the cars in which he had been riding, and that this was negligence and a proximate cause of the injury. The court refused to submit the issue of contributory negligence. It appears that such an issue had been incorporated in his charge before the instrument was submitted to the attorneys for inspection, but because of a general objection to the manner in which the charge was framed, the court eliminated it and refused to submit that issue in any form.

Appellant contends that under the evidence a verdict should have been instructed in its favor and there was no occasion for the submission of the issues of fact passed on by the jury.

It is conceded that in traveling on a drover's pass the deceased was a passenger and was entitled to the high degree of care which should be shown those riding on passenger trains. But the question here is: Was he injured by any culpable lack of care on the part of the appellant or its employees, considering the situation in which he had placed himself at the time? There was really no occasion for McElheny's leaving the car at the time he did. He had been told by Coffey, the foreman of the crew, that when the cars arrived at the place where the pass could be renewed he (Coffey) would notify him. Coffey had a right to expect that McElheny would remain in the car till that notice was given. He was not required to anticipate that when the temporary stop was made McElheny would leave the car without such notice. The evidence is undisputed that none of the employees knew that McElheny was out of the car till he was seen lying on the track, just as the box car passed over his body. In fact, there is no evidence that any of them except Coffey knew he was on that train.

When all of the relevant facts are considered, the only reasonable inference is that the deceased either voluntarily stepped from the running board after the engine was uncoupled and had moved off from the cars, and fell to the ground, or that he was thrown from the running board by a sudden motion of the engine after it was disconnected. It is wholly improbable that the jar testified to by Oscar McElheny as occurring when the engine "slowed down" had anything to do with the fall of the deceased. That jar was caused by the cars rushing against the engine before the latter was disconnected. Had deceased fallen then, his body would have been run over before the engine had moved its length away. If he voluntarily stepped from the running board and lost his balance and fell on the track in front of the moving car, clearly the appellant could not be held responsible for the injury. If he was thrown off by the sud-

den motion of the engine after it was disconnected from the cars, his injuries were not caused by any culpable negligence, or negligence of any character, on the part of the railway company or its employees. Without notice of his presence on the running board, the employees were not required to move the engine with reference to his safety as a passenger at a time when he was expected to be either on the ground, or in the cars from which the engine had been disconnected.

Counsel for appellees insist that because the position of the deceased on the running board was such that the pin-puller, Wright, and the field man, Lyle, might have seen him, the jury had a right to conclude that one or both of them did·see him. Lyle did not testify; the evidence tending to show that he died before the trial. Wright testified that he did not see deceased till just as the cars were passing over his body, and he gives a very satisfactory reason why he did· not see him. His attention was directed elsewhere. Lyle might have seen deceased had he looked down between the car and the engine. That circumstance alone is relied on as proof that Lyle did see him. It has been held that where a person, or an object, is in the line of vision of a railway employee while performing his usual duties, the testimony of the employee that he did not see the person or the object is not conclusive. A jury or a court may find to the contrary. But that rule has no application to a situation where the person or object is not in the line of vision of the employee while in the performance of his ordinary duties. In this instance Lyle was not called upon to look down between the cars. Even if he did discover the deceased, there is nothing to indicate that the discovery was made in time to have prevented the injury.

The evidence did not raise the issue of discovered peril, and the· court did not err in refusing to submit it.

We are of the opinion that the peremptory instruction requested by the appellant should have been given.

The judgment will therefore be reversed and judgment here rendered in favor of the appellant.